# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BARAK CHACOTY, *et al.*,

        *Plaintiffs*,

    v.

MIKE POMPEO,[1] *U.S. Secretary of State*, *et al.*,

        *Defendants.*

Civil Action No. 14-764 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiffs contend that they are U.S. citizens by birth pursuant to 8 U.S.C. § 1401(c). That provision confers birthright citizenship on a person born abroad, as Plaintiffs were, if both her parents are U.S. citizens and one of her parents "has had a residence in the United States" prior to her birth. 8 U.S.C. § 1401(c). Each of the Plaintiffs applied to the State Department for proof of citizenship in the form of a Consular Report of Birth Abroad ("CRBA"). The State Department either denied their CRBA applications or, in the case of two of the Plaintiffs, revoked their previously-issued CRBAs. The Department concluded that Plaintiffs are not U.S. citizens because none of their parents satisfied the residency requirement of § 1401(c). Plaintiffs challenge those decisions under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Due Process Clause of the Fifth Amendment. The Court previously concluded that it has jurisdiction to consider Plaintiffs' claims. The parties' cross-motions for summary judgment on the merits with respect to two representative plaintiffs are now before the Court.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), an "officer's successor is automatically substituted as a party."

Dkt. 52; Dkt. 53. Both of those plaintiffs initially received CRBAs, which the Department subsequently cancelled.

Plaintiffs' motion for summary judgment is premised on the contention that § 1401(c)'s "residence" requirement demands no more than "physical presence" in the United States for any period, no matter how short. They argue that the Department itself once employed that test and that its more recent, more demanding test is arbitrary and capricious. The Department, in its opposition and cross-motion, argues that the two representative plaintiffs may not challenge the cancellation of their CRBAs under the APA because the APA cause of action is available only to plaintiffs who have "no other adequate remedy in a court," 5 U.S.C. § 704, and because 8 U.S.C. § 1503(b) provides an alternative means for a person who is not in the United States to seek a determination of her citizenship. But, even if the APA provides an avenue for challenging the denial or cancellation of a CRBA, the Department continues, the representative plaintiffs' claims fail on the merits because § 1401(c)'s "residence" requirement demands more than fleeting physical presence in the United States.

As explained below, the Court agrees with Plaintiffs that § 1503 does not provide an adequate remedy sufficient to supplant Plaintiffs' APA causes of action (and does not even arguably supplant their stand-alone due process claims) but agrees with the Department that Plaintiffs' claims fail on the merits. The Court, accordingly, will **DENY** Plaintiffs' motion for summary judgment and will **GRANT** the Department's cross-motion.

## I. BACKGROUND

### A. Statutory Framework

"The general rules for acquiring U.S. citizenship are found in 8 U.S.C. § 1401." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 (2017); *see* Immigration and Nationality Act

("INA"), Pub. L. No. 82-414, § 301(a)(3), 66 Stat. 163, 235–36, codified as amended, 8 U.S.C. § 1401. That section provides "rules for determining who 'shall be nationals and citizens of the United States at birth' by establishing a range of residency and physical-presence requirements calibrated primarily to the parents' nationality and the child's place of birth." *Morales-Santana*, 137 S. Ct. at 1686 (quoting 8 U.S.C. § 1401). The subsection relevant here, § 1401(c), confers birthright U.S. citizenship on any person "born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . . prior to the birth of such person." 8 U.S.C. § 1401(c). The INA defines "residence" as "the place of general abode," which in turn refers to a person's "principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33).

Congress has charged the Secretary of State with "the administration and the enforcement of . . . immigration and nationality laws relating to . . . the determination of nationality of a person not in the United States." 8 U.S.C. § 1104. Pursuant to that authority, the Secretary may issue Consular Reports of Birth Abroad—or CRBAs—to U.S. citizens born abroad "[u]pon application and the submission of satisfactory proof of birth, identity and nationality." 22 C.F.R. § 50.7(a). The Secretary is also authorized to cancel a CRBA that was "illegally, fraudulently, or erroneously obtained." 8 U.S.C. § 1504(a); *see also* 22 C.F.R. § 51.62(c). The issuance or cancelation of a CRBA, however, "affect[s] only the document and not the citizenship status of the person." 8 U.S.C. § 1504(a). That is because CRBAs, like passports, do not confer citizenship; rather, they merely provide proof of one's status as a citizen. *See* 22 U.S.C. § 2705(2); 8 U.S.C. § 1504 (a); *see also Xia v. Tillerson*, 865 F.3d 643, 655 (D.C. Cir. 2017) (addressing administrative cancelation of a passport). In the event the Secretary cancels a CRBA, the affected individual may request a hearing to "review the basis for the

. . . cancellation." 22 C.F.R. § 51.70(a). If requested, the hearing is held before a "hearing officer," who considers the relevant testimony and evidence and makes a recommendation to the Deputy Assistant Secretary for Passport Services or her designee in the Bureau of Consular Affairs (hereinafter "the Deputy Assistant Secretary"). *Id.* § 51.71. After reviewing the hearing record and the hearing officer's preliminary findings of fact and recommendation, the Deputy Assistant Secretary renders a "final" decision on whether to uphold or overturn the cancellation of the CRBA. *Id.* § 51.74.

Although not specific to CRBAs, the INA provides a remedy for anyone who is denied a "right or privilege" by the federal government on "the ground that he is not a national of the United States." 8 U.S.C. § 1503. An aggrieved party seeking to take advantage of § 1503 must take one of two paths. If she is "within the United States," § 1503(a) creates a cause of action allowing her to seek a declaration that she is "a national of the United States." 8 U.S.C. § 1503(a); *see also* 28 U.S.C. § 2201 (declaratory judgment remedy). If the aggrieved party is "not within the United States," however, her route to relief under § 1503 is more arduous. Her starting point is § 1503(b), which permits an aggrieved party to apply for a "certificate of identity"—a document allowing the individual to travel "to a port of entry in the United States [to] apply[] for admission"— from the U.S. diplomatic or consular officer in the country in which she resides. 8 U.S.C. § 1503(b); *see also* 22 C.F.R. § 50.11; 7 Foreign Affairs Manual (hereinafter "FAM") 1110 App. H (addressing "Certificates of Identity for Purposes of Traveling to a Port of Entry in the United States and Applying for Admission"). If the consular officer declines to issue a certificate of identity, the applicant may appeal that decision to the Secretary of State. 8 U.S.C. § 1503(b). After the aggrieved party obtains a certificate of identity, she must then travel to the United States and apply for admission at a port of entry "and shall be subject to

all the provisions of" the INA "relating to the conduct of proceedings involving aliens seeking admission to the United States."  8 U.S.C. § 1503(c).  If the Attorney General renders a "final determination" that she is "not entitled to admission," her exclusive recourse is to seek judicial review of the Attorney General's determination by filing a petition for a writ of habeas corpus. *Id.*  As the Supreme Court has observed, "'[t]he net effect of this provision is to require that the determination of the nationality of such person shall be made in accordance with the normal immigration procedures,'" which "include review by habeas corpus proceedings where the issue of the nationality status of the person can be properly adjudicated.'"  *Rusk v. Cort*, 369 U.S. 367, 378-79 (1962) (quoting S. Rep. No. 82-1137, at 50 (1952)).

**B.** **Factual and Procedural Background**

This is not the Court's first occasion to consider whether and how § 1503 applies to Plaintiffs' claims.  The case was originally brought by eighteen Israeli citizens and a Canadian citizen, all of whom were born outside the United States and all of whom claimed that they are U.S. citizens by birth pursuant to 8 U.S.C. § 1401(c).  In a memorandum opinion and order issued in 2018, the Court dismissed the claims of four of the plaintiffs as untimely.  *Chacoty v. Tillerson*, 285 F. Supp. 3d 293, 306 (D.D.C. 2018) ("*Chacoty I*").  As to the remaining plaintiffs, however, the Court denied the Department's motion to dismiss.  The bulk of the Department's motion, and the bulk of the Court's analysis, focused on the question whether Plaintiffs' claims fall within the APA's waiver of sovereign immunity.  *Id.* at 301–04.  That waiver, contained in 5 U.S.C. § 702, is unavailable "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.  The Department argued that 8 U.S.C. § 1503 is such a statute because it provides a mechanism to challenge the denial or cancelation of a CRBA, although that mechanism requires traveling to a port of entry to the

United States, seeking admission, and, if necessary, filing a petition for a writ of habeas corpus. *Chacoty I*, 285 F. Supp. 3d at 302–303.

The Court was unpersuaded, concluding that the Supreme Court had considered, and rejected, the same contention over fifty years ago in *Rusk*, 369 U.S. 367 (1962), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). *Chacoty I*, 285 F. Supp. 3d at 303. In reaching that conclusion, the Court distinguished between the Department's motion to dismiss for lack of subject-matter jurisdiction, which turned on whether the waiver of sovereign immunity in 5 U.S.C. § 702 is available, and the separate question whether a cause of action is available under the APA, which turns on whether some "other adequate remedy in a court" exists within the meaning of 5 U.S.C. § 704. *Id.* at 303–04. Finally, the Court (1) rejected the Department's challenge to the adequacy of Plaintiffs' Third Amended Complaint, finding that the complaint contained sufficient factual specificity to place the Department on reasonable notice that Plaintiffs' claims are based on the legal theory that a single day's presence in the United States is sufficient to satisfy § 1401(c)'s residency requirement, and (2) held that Plaintiffs' due process claims do not seek damages but, rather, seeks only declaratory and injunctive relief, and thus need not satisfy the requirements of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Chacoty I*, 285 F. Supp. 3d at 306–07.

Following a status conference held in February 2018, the Court directed that (1) the Department file an updated administrative record; (2) Plaintiffs "file a motion for summary judgment concerning a maximum of three representative plaintiffs;" and (3) the Department file an opposition and combined cross-motion in response to that motion. Minute Order (Feb. 7, 2018). Plaintiffs, in turn, elected to move for summary judgment on behalf of two of the

remaining fifteen plaintiffs—Kayla and Chana Sitzman.[2]  Dkt. 52.  Because the pending motions

address only the Sitzmans' CRBAs, and because *Chacoty I* sets forth the relevant background in

detail, 285 F. Supp. 3d at 298–300, the Court will only briefly summarize the relevant facts as

they related to the Sitzmans.

Kayla and Chana Sitzman—or, more precisely, their parents acting on their behalf—

applied for and obtained CRBAs from the U.S. Consulate in Jerusalem in 2006.  AR CIV000262.

In support of those applications, their mother "represented that she had been in the United States

for approximately 10 days in 1988 (although the actual year may have been 1990)."  AR

CIV000257.  In 2010, however, the Department cancelled the CRBAs because "the record

show[ed] that the[ir] father, Abraham Sitzman, has never been to the U.S.," and "the record also

shows that the[ir] mother, Masha Bodenheimer, visited the U.S. for approximately ten days as a

child."  AR CIV000287.  The Department concluded that "there is nothing in the record to

indicate that this visit constituted 'residence' in the U.S. for purposes of fulfilling the

requirements of the statute."  *Id.*

After the State Department cancelled the Sitzmans' CRBAs, the sisters challenged that

decision and requested a hearing, which was held on May 11, 2011.  AR CIV000257.  Because

the "recording mechanism" employed at the hearing "failed to record the proceedings," the

parties stipulated to the following facts after the hearing.  AR CIV000262.  "Masha Bodenheimer

---

[2]  Although Plaintiffs' motion briefly addresses the claims of the remaining plaintiffs, that
discussion cannot be squared with the Court's order limiting Plaintiffs' motion to no more than
three representative plaintiffs, and the discussion lacks any reference to the factual or procedural
history relevant to those additional plaintiffs.  The Court, accordingly, construes Plaintiffs'
motion as limited to the Sitzmans' claims.  That understanding is confirmed, moreover, by the
fact that the Department construed Plaintiffs' motion in a similar manner, *see* Dkt. 53-1 at 10; *id*.
at 15 n.5, and Plaintiffs did not dispute that characterization—or mention any of the remaining
plaintiffs—in any of their subsequent briefs.

Sitzman[] was in the United States . . . prior to . . . [Kayla and Chana's'] births" from "July 31, 1974 to September 11, 1974;" from "April 4, 1982 to May 3, 1982;" and "[i]n February 1990, for approximately 10 days." AR CIV000263. "During these sojourns in the United States, the Bodenheimer family stayed with relatives on both sides of the family and participated in family activities and chores as a member of each household with whom they lived although they did not contribute to household finances." *Id.* During the 1974 stay, the family "stopped their mail in Israel," but the Bodenheimers did not "look[] for employment or schooling opportunities." *Id.*

The parties further agreed (1) that, "[a]t the time of the CRBA applications and thereafter until at least 2007, the [United States] Consulate [in Jerusalem] published and disseminated a fact sheet that explained that if both parents were United States citizens, they could transmit citizenship to their children provided that one of the parents could show one day of physical presence in the United States," and (2) that the Sitzmans "applied for, and the Consulate issued, the CRBAs in question" based "upon [those] instructions and explanation of the law in the aforesaid factsheet." *Id.* "Other United States missions," moreover, "have provided similar guidance." *Id.* "The Embassy in Cairo, Egypt, for example, provide[d] the same advice as the Consulate" in Jerusalem, and its "instructions state[d] that parents do not need to prove five years of physical presence if '[b]oth parents are U.S. citizens[,] [and] either of them have any period of physical presence in the U.S." *Id.*

Relying on these stipulated facts, the hearing officer recommended that Kayla and Chana Sitzman "should prevail in this matter and their citizenship should be acknowledged and their CRBAs restored." AR CIV000261. The Deputy Assistant Secretary, reviewing the hearing officer's decision, however, disagreed and concluded that neither of the parents had "resided" within the United States within the meaning of the INA. Dkt. 2822 at 2. The Deputy Assistant

Secretary concluded that "the Hearing Officer's Finding of Fact" and "Recommendation [were] based on flawed reasoning, an incorrect understanding and interpretation of INA 301(c), and a failure to properly apply Department policy to the evidence." Dkt. 28-2 at 3. Instead, in the Deputy Assistant Secretary's view, "[t]he evidence presented with the CRBA applications and at the revocation hearing simply [did] not support the claim that Mrs. [Bodenheimer Sitzman] ever 'resided' in the United States." *Id.* at 2. To the contrary, the fact that Masha Bodenheimer Sitzman visited the United States "on three occasions and that for one of the trips her parents [*i.e.*, Kayla and Chana's grandparents] temporarily stopped mail delivery in Israel while they visited the United States [did] not support the claim that [Masha Bodenheimer Sitzman] had a residence here." *Id.* Because the Deputy Assistant Secretary saw "no evidence that these visits to the U.S. were anything other than vacation visits to see family and attend family events," she upheld the revocations. *Id.*

## II. ANALYSIS

The Department raises two principal challenges to the Sitzmans' APA claims. First, it argues that the APA cause of action is unavailable because 8 U.S.C. § 1503 provides an alternative "adequate remedy" within the meaning of 5 U.S.C. § 704. Second, it argues that, even if the APA cause of action is available, the decision to cancel the Sitzmans' CRBAs was neither arbitrary and capricious nor contrary to law. As explained below, the Court is unpersuaded by the Department's first argument but is convinced by its second.

### A. Whether 8 U.S.C. § 1503 Precludes Plaintiffs' APA Claims

The Department first argues that the Plaintiffs' APA claims fail because 8 U.S.C. § 1503(b) and (c) constitutes an alternative "adequate remedy" within the meaning of 5 U.S.C. § 704. Dkt. 53-1 at 19-23. The APA's cause of action is available only if "there is no other

adequate remedy in a court" for the allegedly unlawful agency action. 5 U.S.C. § 704. Section 704 is neither a grant nor a limitation on the jurisdiction of the federal courts; rather, it defines "a limited cause of action for parties adversely affected by agency action." *Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006); *see also Bennett v. Spear*, 520 U.S. 154, 175 (1997). In *Chacoty I*, the Court rejected the Department's contention that 8 U.S.C. § 1503 "establishes an exclusive remedy [such that] the waiver of sovereign immunity contained in § 702 of the APA [is] unavailable, and the Court [therefore] lack[s] jurisdiction." 285 F. Supp. 3d at 302–03. The Court did not, however, reach the question whether § 704's separate "adequate alternative remedy" requirement "provides a basis to challenge the legal sufficiency of Plaintiffs' claim." *Id.* at 304.

The Department now presses that argument, positing that "the procedure laid out in" 8 U.S.C. § 1503 "provides Plaintiffs with an adequate remedy" within the meaning of 5 U.S.C. § 704. Dkt. 53-1 at 21. For support, the Department points to two judicial precedents: one from the D.C. Circuit, which the Department contends is controlling and compels dismissal, *id.* at 22, and one from the Fifth Circuit, which the Department contends is both on point and persuasive, *id.* at 21. The Court disagrees on both counts. As explained below, the D.C. Circuit precedent is not on point, and the Fifth Circuit precedent is on point but unpersuasive.

The Department first argues that the D.C. Circuit recently resolved the question presented in *Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017). In *Xia*, five former Chinese nationals challenged the administrative revocation or non-renewal of their United States passports under both the APA and the INA. *Id.* at 648. In addressing the plaintiff's claims that they were denied adequate process, the D.C. Circuit observed that, "[i]f plaintiffs believe that they are United States citizens and that [the U.S. Citizenship and Immigration Service] erroneously invalidated

their certificates of naturalization and passports, they may pursue . . . [§] 1503 claims." *Id.* at 655. The only reason that § 1503 failed to provide the plaintiffs with a means of seeking review was that the plaintiffs had sued in the wrong venue; a person present in the United States may file suit under § 1503(a) only in "the district in which such person resides or claims a residence." 8 U.S.C. § 1503(a); *see also Xia*, 865 F.3d at 655. From this, the Department infers that *Xia* held that § 1503(b) and (c) provide an "adequate remedy" in circumstances analogous to those present here.

That, however, is not what the D.C. Circuit said or did. To be sure, the district court had held, in the alternative, that § 1503(a) "provides an adequate alternative judicial remedy for plaintiffs, thus barring any APA claim." *Xia*, 865 F.3d at 649. But that conclusion provides no aid to the Department in this case, which involves the entirely different remedies available to putative citizens outside the Untied States under 8 U.S.C. § 1503(b) and (c). Moreover, the D.C. Circuit did not hold that § 1503 provided an adequate alternative remedy that precluded the plaintiffs' APA claims. To the contrary, the Court of Appeals discussed § 1503 only in the context of the plaintiffs' due process claims and the district court's denial of leave to amend based on § 1503's venue requirements. Any doubt about the scope of the D.C. Circuit's decision, moreover, is put to rest by the court's disposition of the appeal, which reversed the district court's dismissal of the plaintiffs' APA claims and remanded the case, "without prejudice to plaintiffs' ability to seek leave to file amended complaints in the correct venues to clarify and develop their APA and [§] 1503 claims." *Id.* at 661. Thus, even read most favorably to the Department, *Xia* did not reach the question whether § 1503(a)—much less § 1503(b) and (c)— provides an alternative, adequate remedy "barring any APA claim," and it merely left that question for further consideration by the district court on remand or by the transferee court. *Id.*

This Court, accordingly, must determine for itself whether § 1503 provides an "adequate remedy." In limiting the APA cause of action to cases in which "there is no other adequate remedy in a court," 5 U.S.C. § 704, Congress resolved "that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Citizens for Responsibility & Ethics in Wash. v. U. S. Dep't of Justice*, 846 F.3d 1235, 1244 (D.C. Cir. 2017) ("*CREW*") (*quoting Bowen v. Massachusetts*, 487 U.S. 879, 903, (1988)). Although an "alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre,'" *Garcia v. Vilsack*, 563 F.3d 519, 522 (D.C. Cir. 2009) (internal citation omitted), Courts must not "constru[e] [§ 704] to defeat the [APA's] central purpose of providing a broad spectrum of judicial review of agency action," *Bowen*, 487 U.S. at 903. In conducting its inquiry into whether "an alternative remedy is 'adequate' and therefore preclusive of APA review," the Court must therefore look for signs of "'legislative intent' to create a special, alternative remedy and thereby bar APA review." *CREW*, 846 F.3d at 1244 (quoting *Garcia*, 563 F.3d at 523); *see also U.S. Army Corps of Eng. v. Hawkes Co.*, 136 S. Ct. 1807, 1815–16 (2016). The question, then, is whether 8 U.S.C. § 1503(b) and (c) evinces such a "legislative intent."

As explained in *Chacoty I*, § 1503 provides two paths to challenge the denial of a "right or privilege as a national of the United States" on the ground that the applicant "is not," in fact, "a national of the United States." 8 U.S.C. § 1503. The first path is available only to those who are "within the United States." *Id*. § 1503(a). The second path—and the one relevant here— applies to those outside the United States, and it requires that the aggrieved party take a number of steps before obtaining judicial review. *Id.* § 1503(b), (c). An aggrieved party's starting point

is § 1503(b), which establishes a process to apply for a "certificate of identity" from the U.S. diplomatic or consular officer in the country in which she resides. 8 U.S.C. § 1503(b). A certificate of identity does not address the question of citizenship but, rather, merely permits the recipient to travel to the United States to apply for admission. *See* 22 C.F.R. § 50.11; *see also* Foreign Affairs Manual, 7 FAM 1100 App. H, Dep't of State. If the consular officer declines to issue a certificate of identity, the applicant may appeal that decision to the Secretary of State, "who, if he approves the denial, shall state in writing his reasons for his decision." 8 U.S.C. § 1503(b). Once the aggrieved party obtains a certificate of identity, she may then travel to the United States and apply for admission at a port of entry and, in that context, may assert that she is a U.S. citizen or is otherwise admissible. *Id.* § 1503(c). In seeking admission, the aggrieved person is "subject to all the provisions of [the INA] relating to the conduct of proceedings involving aliens seeking admission to the United States." *Id.* If, in the course of those proceedings, the Attorney General ultimately determines that she is not a U.S. citizen and therefore "not entitled to admission," the aggrieved party's exclusive recourse is to seek judicial review of the Attorney General's citizenship determination by filing a petition for a writ of habeas corpus. *Id.*

The Department contends that these procedures provide an "adequate alternative remedy" precluding APA relief. For support, it points to the Fifth Circuit's recent decision in *Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018), *cert. denied*, 139 S. Ct. 1319 (2019). In that case, a divided panel of the Fifth Circuit held that § 1503 "expresses a clear congressional intent to provide a specific procedure to review [citizenship] claims" and that "[p]ermitting a cause of action under the APA would provide a duplicative remedy, authorizing an end-run around that process." *Id.* The Fifth Circuit reasoned that § 1503 "articulates two bases for reaching the

courts to remedy their claims:" parties may "file a habeas petition if denied admission at the port of entry, or, if granted admission, they are permitted to file a declaratory judgment action." *Id.* "The only instance in which the Plaintiffs might not receive judicial review," the panel reasoned, "is if their petitions for certificates of identity are denied by the Secretary [of] State[,] . . . but the mere chance that the Plaintiffs might be left without a remedy in court does not mean that the § 1503 is inadequate as a whole." *Id.* Concluding that the process described in § 1503 "provides a direct and guaranteed path to judicial review" and "comprise[s] 'both agency obligations and a mechanism for judicial enforcement,'" *id.* (quoting *CREW*, 846 F.3d at 1245), the panel majority concluded that § 1503 "expresses a clear congressional intent" to preclude suit under the APA, *id.* In the Department's view, *Hinojosa* was correctly decided. *Id*; *see also* Dkt. 53-1 at 21.

The Court is unpersuaded. The Supreme Court's decision in *Cort* is, once again, on point. In that case, as here, the State Department argued that § 1503(b) and (c) "provide[s] the exclusive procedure under which" an aggrieved party outside the United States may "attack the administrative determination that he [is] not a citizen." *Id.* at 370. The Court, accordingly, framed "the question posed" as "whether the procedures specified in [§ 1503(b) and (c)] provide the only method of reviewing the Secretary of State's determination" to decline issuing a passport or other evidence of U.S. citizenship to an aggrieved party residing outside the United States. *Id*. at 375. And that was the question the Court answered, "hold[ing] that a person outside the United States who has been denied a right of citizenship is not confined to the procedures prescribed" in § 1503(b) and (c) "and that the remedy [provided in the APA is] an appropriate one." *Id.* at 379.

When Congress enacted the APA, it recognized that it was legislating against a backdrop of various (existing and future) statutory provisions governing the review of agency actions, and Congress took care to avoid the disarray that would result from the creation of duplicative and potentially conflicting rules. *See Bowen*, 487 U.S. at 903. "At the time the APA was enacted," for example, "a number of statutes creating administrative agencies defined the specific procedures to be followed in reviewing a particular agency's action," including procedures that at times provided for direct review of agency orders "in the regional courts of appeals." *Id.* The alternative, adequate remedy "exception was intended to avoid such duplication," *id.*, while preserving the "broad spectrum of judicial review" authorized by the APA. *Id.* The ultimate question, accordingly, is one of congressional intent: that is, would permitting Plaintiffs to assert an APA cause of action promote the APA's goal of establishing "generous review provisions," *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967), *abrogated on other grounds by Califano*, 430, U.S. 99, or would it frustrate the APA's goal of avoiding a crazy quilt of judicial review provisions? *Cort* answers that question—"the Court will not hold that the broadly remedial provisions of the [APA] are unavailable to review administrative decisions" denying passports or other documents evidencing U.S. citizenship to those residing outside the United States," 369 U.S. at 379–80—and this Court is bound by that decision.

To be sure, as the Court observed in *Chacoty I*, *Cort* did not refer to the adequate-alternative-remedy exception to the APA, which is codified at 5 U.S.C. § 704. *Id.* at 371. It did, however, quote the separate provision of the APA, codified at 5 U.S.C. § 703, which requires that an aggrieved party rely on "any special statutory review" provision "relevant to the subject matter in any court specified by statute," but only if that form of statutory review is adequate. 369 U.S. at 371–72 (quoting § 10(b) of the APA, as originally enacted). Even more importantly,

*Cort* applied—almost word-for-word—the same test that governs for purposes of 5 U.S.C. § 704. Under existing D.C. Circuit case law, "[w]hen considering whether an alternative remedy is 'adequate' and therefore preclusive of APA review," a court must "look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *CREW*, 846 F.3d at 1244 (quoting *Garcia*, 563 F.3d at 523). That test comes from the Supreme Court's decision in *Abbott Laboratories v. Gardner*, which, in turn, quotes *Cort* for the proposition that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should courts restrict access to judicial review" under the APA. 387 U.S. at 14 (quoting *Cort*, 369 U.S. at 379–80). Thus, *Cort*, like *Abbott Labs* and *CREW*, counsels that courts should "not hold that the broadly remedial provisions of the [APA] are unavailable to review administrative decisions . . . in the absence of clear and convincing evidence that Congress so intended." *Cort*, 369 U.S. at 379-80. It is this test that governs for purposes of the adequate-alternative-remedy exception to § 704, and it is this test that *Cort* held is not satisfied by § 1503(b) and (c) when an aggrieved party outside the United States seeks to challenge the denial of "a right of citizenship" by the Department under the APA. *Cort*, 369 U.S. at 379.

The evidence of legislative intent that *Cort* relied upon, moreover, is both substantial and applicable in the present context. The Supreme Court noted, for example, that its decisions "both before and after the enactment of the" APA had recognized "that an action for a declaratory judgment is available as a remedy to secure a determination of citizenship." *Id.* at 372. It observed that a challenge brought under § 1503(b) and (c) "would culminate in litigation not against the Secretary of State whose determination is . . . being attacked, but against the Attorney General," raising "a not insubstantial question" as to "[w]hether such litigation could properly be

considered review of the Secretary's determination." *Id.* at 375. It stressed that § 1503(b) and

(c) are permissive, merely providing that an aggrieved party "may" apply for a certificate of

identity and "may" seek admission into the United States. *Id.* And, more generally, it held that

nothing in the relevant statutory text, legislative history, or the Court's prior decisions reflected a

congressional intent to require a person living abroad to "travel thousands of miles, be arrested,

and go to jail in order to attack an administrative finding that he is not a citizen of the United

States," particularly in light of the "liberal provisions of the" APA. *Id.*

The *Hinojosa* majority declined to rely on *Cort* because "it is unclear to what degree

that [*Cort*] remains good law in light of *Califano*" and "whether and to what extent [*Cort*] is or

remains an instructive account of the adequacy requirement." *Hinojosa*, 896 F.3d at 313. But

neither of these objections is sound. In *Califano v. Sanders*, the Supreme Court overruled *Cort*

only to the extent that *Cort* "assumed . . . that the APA is an independent grant of subject-matter

jurisdiction," 430 U.S. at 105, and "*Cort*'s holding that § 1503 is not an exclusive remedy. . .

remains good law," *Chacoty I*, 285 F. Supp. 3d at 303 n.5. Nothing in *Califano* raised any

question about *Cort*'s conclusion that Congress did not intend for § 1503(b) and (c) to create an

exclusive remedy—preclusive of APA review—for aggrieved parties residing outside the United

States.

The *Hinojosa* majority further posited that, even if still good law, *Cort*'s "holding is

inapplicable" because "the path to judicial review for the [*Hinojosa*] Plaintiffs [was] far

less treacherous because neither has been criminally indicted and thus [neither risked]

incarceration upon arrival." *Hinojosa*, 896 F.3d at 313–14. This Court considered—and

rejected—a nearly identical argument in *Chacoty I*. As the Court explained, the Supreme

Court's reasoning in *Cort* sweeps more broadly than the particular circumstances of that case,

17

*see Chacoty I*, 285 F. Supp. 3d at 303, and, in any event, it is not at all clear that the path the Plaintiffs face here is, in fact, substantially "less treacherous" than the one Cort faced. The Supreme Court observed that Cort would have had to "travel thousands of miles, be arrested, and go to jail in order to attack an administrative finding that he is not a citizen of the United States." *Cort*, 369 U.S. at 375. Similarly, Plaintiffs here would have to travel thousands of miles to the United States, risk detention and removal proceedings, and file a habeas petition to obtain judicial review. Plaintiffs, unlike Cort, do not face criminal indictments in the United States. But, as the *Hinojosa* dissent emphasized, those who seek to challenge an administrative decision under § 1503(b) and (c) "still face the risk of burdensome proceedings under the [INA], including [possible] detention during the pendency of their applications and, if their applications for admission are ultimately denied, removal." *Hinojosa*, 896 F.3d at 317 (Dennis, J., dissenting). *Cort* held in broad terms "that a person outside the United States who has been denied a right of citizenship is not confined to the procedures prescribed in" § 1503(b) and (c), and nothing in that holding turned on the Supreme Court's passing reference to the specific burdens Cort faced. 369 U.S. at 379.

The Department also relies on *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320 (D.D.C. 2018), and other cases addressing the question whether 8 U.S.C. § 1503(a) provides an alternative, adequate remedy. *See* Dkt. 53-1 at 11 (citing cases collected in *Villarreal v. Horn*, 203 F. Supp. 3d 765, 773 (S.D. Tex. 2016); *Hassan v. Holder*, 793 F. Supp. 2d 440, 445 (D.D.C. 2011)). But that reliance is misplaced. The remedial scheme provided for in 8 U.S.C. § 1503(a) differs in material respects from 8 U.S.C. § 1503(b) and (c). It does not require the aggrieved party to obtain a certificate of identity and then travel to the United States. It does not require the aggrieved party to submit to removal proceedings and possible detention. And it permits the

aggrieved party to bring a declaratory judgment action against the Secretary of State, rather than filing a habeas petition challenging the Attorney General's separate decision to deny admission into the United States. Each of these factors played a role in the Supreme Court's decision in *Cort*, and *Cort* itself did not address the availability of the APA to bring a challenge to the revocation of a passport or other evidence of U.S. citizenship by a "person who is within the United States." 8 U.S.C. § 1503(a). For present purposes, this Court can do likewise and thus expresses no view about whether a person who is in the United States may bring an APA claim challenging cancellation of a CRBA or similar record.

Finally, the Department says nothing about Plaintiffs' stand-alone due process claims. Those claims survive regardless of whether Plaintiffs have a cause of action under § 704. As discussed, the Court concluded in *Chacoty I* that the APA's waiver of sovereign immunity applies to Plaintiffs' claims. 285 F. Supp. 3d at 302–03. Once triggered, however, that waiver "is not limited to APA cases—and hence . . . it applies regardless of whether the elements of an APA cause of action are satisfied." *Trudeau*, 456 F.3d at 187. That is dispositive because "[t]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself," *Hubbard v. U.S. E.P.A. Adm'r*, 809 F.2d 1, 11 (D.C. Cir. 1986), and thus Plaintiffs need not rely on the APA to bring a due process challenge to the revocation of their CRBAs. As a result, § 704's adequate-alternative-remedy requirement has no bearing on plaintiffs' stand-alone due process claims. It is, of course, possible that the Department may have a separate argument as to why Plaintiffs cannot pursue their due process claims, but it did not address the issue in its motion or opposition.

The Court, accordingly, concludes that 8 U.S.C. § 1503(b) and (c) does not preclude Plaintiffs' cause of action under the APA or the Due Process Clause.

**B.     Review Under APA Section 706**

Before turning to the merits, it bears consideration what is—and what is not—raised in Plaintiffs' sparse briefs.  Although their complaint is more sweeping, their brief in support of summary judgment, Dkt. 52, their sur-reply brief, Dkt. 58, and, most significantly, their brief in opposition to the Department's cross-motion, Dkt. 56, raise (at best) three contentions:  First, and at the core of their case, Plaintiffs argue that "any physical presence" in the United States is sufficient to satisfy the "residence" requirement of 8 U.S.C. § 1401(c).  Dkt. 52 at 6.  Second, although raised only in a sur-reply, they add that the Department's contrary interpretation is not entitled to *Chevron* deference.  Dkt. 58 at 1.  Third, Plaintiffs contend that, even if the Department's current reading of the statute is permissible, its prior reading—which required only brief physical presence—is also permissible, and "fundamental fairness require[s] that the Department honor the CRBAs that were issued based on this [prior] interpretation."  Dkt. 52 at 5 (quoting AR CIV000260).  What is not at issue is the revocation of a grant of citizenship, which implicates "a question of such gravity," *Baumgartner v. United States*, 322 U.S. 665, 670 (1944), that revocation can only be accomplished by "clear, unequivocal, and convincing" evidence, *Schneiderman v. United States*, 320 U.S. 118, 125 (1943); *see also Xia*, 865 F.3d at 654 (collecting cases applying the standard).  Rather, as explained above, a CRBA merely evidences a person's status as a U.S. citizen and, as such, its cancellation "shall affect only the document and not the citizenship status of the person in whose name the document was issued."  8 U.S.C. § 1504(a); *see also*  22 U.S.C. § 2705(2); *Xia*, 865 F.3d at 655.

The Court will start by considering whether the Department's current reading of 8 U.S.C. § 1401(c) is lawful and will then turn to the question whether the Department acted lawfully when it revoked the Sitzmans' previously-issued CRBAs.

1. *Is the Department's Current Reading of 8 U.S.C. § 1401 Permissible?*

Under 8 U.S.C. § 1401(c), U.S. citizenship is conferred at birth on "a person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States . . . prior to the birth of such person." The INA defines "residence" as "the place of general abode" and, in turn, defines "the place of general abode of a person" as "his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33). Here, Plaintiffs contend that Kayla and Chana Sitzman's mother, Masha Bodenheimer Sitzman, satisfied § 1401(c)'s "residence" requirement before their birth because she was present in the United States prior to their birth on three occasions: from July 31, 1974 to September 11, 1974; from April 4, 1982 to May 3, 1982; and "for approximately 10 days" in February 1990. AR CIV000263. During these visits, Marsha "stayed with relatives on both sides of [her] family and participated in family activities and chores as a member of each [of these] household[s]," although her immediate family "did not contribute to household finances." *Id.* During the 1974 stay, moreover, Marsha's family "stopped their mail in Israel" but did not "look[] for employment or schooling opportunities" in the United States." *Id.*

The parties agree on the relevant facts but advocate for conflicting views of the "residence" requirement. In Plaintiffs' view, the hearing officer was correct when he concluded as follows:

> The Department [previously] advised the public and specifically Mr. and Mrs. Sitzman that any presence in the United States would satisfy the residence requirement in the case of a CRBA application where both parents are United States citizens. . . . [This] is a logical interpretation of the statute under the circumstances.

> It appears that the Department is now attempting to define a condition somewhere between "residence" (where intent to remain in the United States is not relevant) and "domicile" (where intent is the sine qua non of the definition).

This is not supported by the statute or the case law.  It is also inconsistent with well[-]developed common law.

Dkt. 52 at 4–5 (quoting AR CIV000260).

The Department, for its part, contends that the Deputy Assistant Secretary—who was authorized to review the hearing officer's decision—got it right when she concluded as follows:

> In drafting [8 U.S.C. § 1401(c)], Congress chose to use "residence" rather than "physical presence" and did not set a time limit, the rationale being that the nature of a residence presupposes the sort of relationship to that place that mere physical presence does not. . . .  Under [the INA's] definition, residence is much more than an address or a place one visits on a vacation. Residence is an individual's principal actual dwelling place.  A person has a different relationship to his/her residence than to any other place.
>
> The concept of residence is inherently more complex than the more literal concept of physical presence.  Residence is not determined solely by the length of time spent in a place, but also takes into account the nature and quality of the person's connection to the place.  Residence involves the connection to a specific physical place; it is more than a temporary presence. Generally, visits to the United States are insufficient to meet the definition of residence under the INA and thus cannot be used to confer citizenship under [8 U.S.C. § 1401(c)].  While no specific period of residence is mentioned in the statute, Congress' use of the term "residence" requires a close examination, on a case by case basis, of the facts related to one's stay in the United States to determine if it falls within the INA's definition of "residence." Residence is not a state of mind but a state of affairs to be demonstrated by objective facts.  Department guidance also clearly states that residence is more than a temporary presence and that visits to the United States are insufficient to establish a residence for the purposes of citizenship transmission under [8 U.S.C. § 1401(c)].

Dkt. 28-2 at 2.

In short, under the reading of the INA that Plaintiffs advocate, any physical presence in the United States short of "transiting the United States on [one's] way to another country" is sufficient, Dkt. 52 at 4 (quoting AR CIV000260), while, under the reading that the Department now advocates, residence requires more than "physical presence" and requires consideration of "the nature and quality of the person's connection to the place," Dkt. 28-2 at 2.  The parties

disagree, in the first instance, about what deference, if any. the Court owes the Department's reading of the statute.

a. _Chevron_ Deference

The Department contends that its interpretation of the statute is entitled to deference under _Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc._, 467 U.S. 837, 842–43 (1984). Dkt. 53-1 at 24–26. That interpretation appears, to one extent or another, in multiple places. One provision of the FAM in effect at the time Kayla and Chana Sitzman received their CRBAs and at the time their CRBAs were cancelled, for example, instructs that the INA does not specify "the length of residence required to transmit citizenship" but that the parent must have maintained "a _place of general abode_ in the United States." 7 FAM 1134.3-1 (updated April 1, 1998) (emphasis added). Another provision of the FAM has long instructed that more than "temporary presence" is required to satisfy the residence requirement and that mere "[v]isits to the United States by citizen parents prior to the birth of the child will" not suffice. 7 FAM 1134.3-2(a) (updated April 1, 1998). The Deputy Assistant Secretary's decision in the present matter is consistent with that instruction, opining that "[r]esidence is not determined solely by the length of time spent in a place, but also takes into account the nature and quality of the person's connection to the place" and requires more than "temporary presence." Dkt. 28-2 at 2. According to the Department, each of these pronouncements is entitled _Chevron_ deference. Dkt. 53-1 at 25.

Starting with the FAM, the Supreme Court has suggested that, at least in general, "agency manuals" lie "beyond the _Chevron_ pale." _United States v. Mead Corp._, 533 U.S. 218, 234 (2001); _see also Christensen v. Harris Cty._, 529 U.S. 576, 587 (2000); _Reno v. Koray_, 515 U.S. 50, 61 (1995). To be sure, the Supreme Court has also held that notice-and-comment rulemaking

is not a *sine qua non* for *Chevron* deference and that courts must consider a range of factors, including "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Bernhart v. Walton*, 535 U.S. 212, 221 (2002). But those courts that have decided the specific question presented here have declined to defer to the FAM. *See*, *e.g.*, *Jaen v. Sessions*, 899 F.3d 182, 187 n.4 (2d Cir. 2018); *Scales v. INS*, 232 F.3d 1159, 1165–66 (9th Cir. 2000); *Farrell v. Tillerson*, 315 F. Supp. 3d 47, 67 (D.D.C. 2018); *cf. Miller v. Clinton*, 687 F.3d 1332, 1341 n.9 (D.C. Cir. 2012) (reserving decision on whether the FAM warrants judicial deference). The Department has failed to offer substantial grounds to reach a different conclusion in this case. At best, therefore, the Department's argument that the Court should defer to the FAM faces an uphill battle.

The Department's contention that *Chevron* applies to the Deputy Assistant Secretary's written decision is on somewhat firmer ground. The D.C. Circuit's decision in *Fox v. Clinton*, 684 F.3d 67 (D.C. Cir. 2012), is instructive. In that case, the plaintiff sought a Certificate of Loss of Nationality ("CLN") from the State Department. *Id.* at 72, 76. After the plaintiff submitted evidence to the Department, a Department official denied the plaintiff's request. *Id.* at 76. The plaintiff then "filed an informal appeal of the agency's denial" with the Director of the Department's Office of Policy Review and Interagency Liaison (the "Director"). *Id.* at 76–77. After requesting additional information from the plaintiff's attorney, the Director issued "the agency's final decision" declining to issue the requested CLN. *Id.* at 73–74.

Although recognizing that agency adjudications at times warrant *Chevron* deference, the D.C. Circuit concluded that the Director's written decision did not qualify. *Id.* at 77–80. The

court identified a number of factors relevant to whether *Chevron* applies to an informal adjudication, including whether "the agency's interpretation . . . was offered in an 'exhaustive [adjudicative] decision;'" whether "the agency 'was acting pursuant to an express delegation from Congress;'" whether "the agency was addressing 'precisely the sort of complex, interstitial questions that the [agency] deserves deference to address;'" whether "the agency's judgment 'reflect[ed] a longstanding agency policy;'" whether the statutory regime at issue is complex and required the agency to "'careful[ly] craft . . . the scheme it devised to reconcile various statutory provisions;'" and, finally, whether "the agency interpretations were clearly intended to have general applicability and the force of law." *Id.* (alterations in original) (citations omitted). Applying these factors, the D.C. Circuit declined to defer to the Director's written decision, "particularly because there [was] nothing in it to give deference to." *Id.* at 78. Rather, it "offered little more than uncited, conclusory assertions of law in a short, informal document that does not purport to set policy for future CLN determinations." *Id.*

As compared to the letter at issue in *Fox*, the Deputy Assistant Secretary's written decision here presents a stronger case for applying the *Chevron* framework, although not all of the *Fox* factors point in the same direction. First, the Deputy Assistant Secretary's decision falls somewhere between an "exhaustive" decision and the type of cursory analysis at issue in *Fox*. *Id.* at 77. In the course of a two-and-a-half-page decision, the Deputy Assistant Secretary addressed the principal arguments raised in the hearing officer's decision and pressed by Plaintiffs; considered the statutory text; and analyzed the relevant facts. *See* Dkt. 28-2 at 1–3. But, like the *Fox* letter, the Deputy Assistant Secretary did not "cite . . . controlling authority" in the course of her decision. 684 F.3d at 80. Second, the Deputy Assistant Secretary was acting pursuant to an express delegation from Congress, which charged the Secretary of State with

cancelling any CRBA "erroneously obtained" and which required the Department to adopt "procedures for seeking a prompt post-cancellation hearing." 8 U.S.C. § 1504(a). Third, although the scheme at issue here is less complex than schemes like the Hatch-Waxman Amendments at issue in *Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004), the meaning of the term "residence" in 8 U.S.C. § 1101(a)(33) applies throughout the INA and requires an understanding of how the definition fits with each of the relevant substantive provisions. *See, e.g.*, 8 U.S.C. § 1430 ("Married persons and employees of certain nonprofit organizations"); 8 U.S.C. § 1436 ("Nationals but not citizens; residence within outlying possessions"); 8 U.S.C. § 1439 ("Naturalization through service in the armed forces") (all defining "residence" pursuant to 8 U.S.C. § 1101(a)(33)). Finally, although there is no evidence that the Deputy Assistant Secretary's decision was widely disseminated, it had the "force of law" and appears—at least based on the Deputy Assistant Secretary's statements in the letter itself—to have been part of an effort to bring greater consistency to the Department's resolution of CRBA applications. *See* Dkt. 28-2 at 3.

Whether the Deputy Assistant Secretary's decision is entitled to *Chevron* deference, accordingly, presents a close question. The Court need not decide that issue, however, because—whether considered under *Chevron* or not—the Department's reading of the statute is, in any event, the better reading. This is not to say that the term "residence" is unambiguous in all respects. There will undoubtedly be cases in which the Department must draw lines. For present purposes, however, the Court need not enter that thicket, because even if the Court were to agree with Plaintiffs that the Deputy Assistant Secretary's decision falls beyond *Chevron*'s scope, Plaintiffs would still have to show that they have the better reading of the statute. They cannot pass that test.

b.      The Department's Reading of "Residence"

Under Plaintiffs' construction of the INA, an individual can satisfy the "residence" requirement so long as she can demonstrate "any physical presence short of a brief, hours-long transit through the United States." Dkt. 52 at 6. Or, in the words of the initial hearing officer, "a person who is merely transiting the United States on his way to another country is not a 'resident' but almost anyone else would seem to satisfy the definition." *Id.* at 4 (quoting AR CIV000260). The Deputy Assistant Secretary disagreed, and in her final determination she concluded that residence requires more than "physical presence" and requires consideration of "the nature and quality of the person's connection to the place." Dkt. 28-2 at 2. Even without granting any deference to the Deputy Assistant Secretary, the Department has the better reading of the statute.

The Court "begin[s], as usual, with the statutory text." *Maslenjak v. United States*, 137 S. Ct. 1918, 1924 (2017). The INA defines "residence" as an individual's "place of general abode," which means his or her "principal, actual dwelling place in fact, without regard to intent." 8 U.S.C. § 1101(a)(33). This statutory definition is at odds with Plaintiffs' contention that "almost anyone . . . would seem to satisfy the [INA's] definition," short of "a person who is merely transiting the United States on his way to another country." AR CIV000260. Most notably, Plaintiffs' interpretation would read the words "place of *general* abode" and "*principal*, actual dwelling place" out of the statute. 8 U.S.C. § 1101(a)(33) (emphasis added). The statute does not simply require that the putative citizen's parent have "dwelled" or been present in the United States for a limited time; it requires that the parent's abode in the United States eclipse any other residence the parent had at the time. The statutory definition of "residence," in other words, requires a degree of primacy over other places of residence. *See, e.g.*, *De Rodriguez v. Holder*,

724 F.3d 1147, 1151 (9th Cir. 2013) ("The statute does not treat every dwelling in which an alien stays as a new residence; the text instructs courts to take a wider view, deeming the '*principal,* actual dwelling place' and 'the place of *general* abode' to be the residence." (emphasis in original)); *Michael v. INS*, 48 F.3d 657, 663 n.5 (2d Cir. 1995) ("We have previously described the term residency—as used in the immigration context—as 'an established abode, for personal or business reasons, permanent for a time.'" (quoting *Rosario v. INS,* 962 F.2d 220, 224 (2d Cir. 1992))). If Plaintiffs' understanding of the statute was correct, Congress could have defined "residence" as any place at which the individual was physically present or any place where the individual "dwelled." But that is not what Congress did. It limited the statutory definition to the individual's "place of *general* abode" and "*principal*, actual dwelling place," 8 U.S.C. § 1101(a)(33) (emphasis added), and the Court must endeavor to give meaning to all of the words Congress employed. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)

The Department's interpretation, in contrast, sets forth criteria for determining whether a location is, in fact, an individual's "*principal*, actual dwelling place." 8 U.S.C. § 1101(a)(33) (emphasis added). In describing how the Department would evaluate "residence" in each case, the Deputy Assistant Secretary explained:

> Residence is not determined solely by the length of time spent in a place, but also takes into account the nature and quality of the person's connection to the place. Residence involves the connection to a specific physical place; it is more than a temporary presence . . . . While no specific period of residence is mentioned in the statute, Congress' use of the term "residence" requires a close examination, on a case by case basis, of the facts related to one's stay in the United States to determine if it falls within the INA's definition of "residence." Residence is not a state of mind but a state of affairs to be demonstrated by objective facts.

Dkt. 28-2 at 2. Applying this definition to the Sitzmans, the Deputy Assistant Secretary examined "the fact that Mrs. [Bodenheimer Sitzman] visited [the United States] on three occasions and that for one of the trips her parents temporarily stopped mail delivery in Israel

while they visited the United States does not support the claim that Mrs. [Bodenheimer Sitzman] had a residence here." *Id.* The Deputy Assistant Secretary concluded there was "no evidence that these visits to the U.S. were anything other than vacation visits to see family and attend family events." *Id.*

According to Plaintiffs, this multi-factor inquiry contradicts the text of the statute. They stress that Congress specified that residence should be determined "without regard to intent." Dkt. 28 at 16–24. The Department, in their view, may not scrutinize "the nature and quality of the person's connection to the place" or the facts related to one's stay in the United States because these considerations go to a person's subjective connection to a place. Dkt. 28 at 21. But, the phrase "without regard to intent" cannot bear the weight that Plaintiffs give it. Rather, as the Deputy Assistant Secretary opined, it is possible to apply the Department's—and Congress's—understanding of "residence" based on objective criteria unrelated to the individual's state of mind. Dkt. 28-2 at 2. The question is not whether the individual intended to remain in the United States and to abandon any other place of residence; it is whether the individual, in fact, established a "principal" dwelling in the United States.

Although the answer to that question will at times require difficult line drawing, one thing is clear: the statute requires *something* more than fleeting physical presence in the United States. That much is evident from the fact that Congress differentiated between "residence" and "physical presence." *Compare* 8 U.S.C. § 1401(g) (providing citizenship to "person[s] born outside the geographical limits of the United States . . . [to] parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person[s], was *physically present* in the United States or its outlying possessions for a period or periods totaling not less than five years") (emphasis added), *with* 8 U.S.C. § 1401(c) (providing citizenship at birth to

"person[s] born outside of the United States . . . [to] parents both of whom are citizens of the United States and one of whom has had a *residence* in the United States . . . prior to the birth of such persons") (emphasis added). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (internal quotation and citation omitted); *see also Chien Fan Chu v. Brownell*, 247 F.2d 790, 796 (D.C. Cir. 1957) ("We are bound to conclude that when Congress used these differing terms in the same act . . . making each word applicable to a different thing, it did not intend the carefully distinguished and separately defined words to mean the same thing." (internal quotations omitted)). Although this rule of interpretation is not absolute, Plaintiffs offer no explanation why it should not apply here and, even more to the point, they offer no authority—legal or otherwise—for the proposition that the terms "residence" and "physical presence" mean the same thing.

The INA's legislative history makes the distinction between objective place of residence and physical presence even clearer. According to a 1952 Senate Judiciary Committee Report, the statute's definition of "residence" is meant to be "a codification of judicial constructions of the term 'residence' as expressed by the Supreme Court of the United States in *Savorgnan v. United States*, [338 U.S. 491, 505 (1950)]." S. Rep. No. 82–1137, at 4–5 (1952); *see also United States v. Arango*, 670 F.3d 988, 997 (9th Cir. 2012). In *Savorgnan*, the Supreme Court held that a United States citizen who obtained Italian citizenship and lived in Italy from 1941 to 1945 relinquished her American citizenship. *Savorgnan*, 338 U.S. at 496. The petitioner argued that, even though she swore allegiance to Italy and lived there, she had not actually expatriated. *Id.* at 499. Noting that expatriation occurred when an individual naturalized as a foreign citizen and

then "resided" abroad, she argued that she had no "intention of establishing a permanent residence abroad or abandoning her residence in the United States, or of divesting herself of her American citizenship." *Id.* at 496. The Supreme Court disagreed. It concluded that "[w]hatever may have been her reasons, wishes or intent, her principal dwelling place was in fact with her husband in Rome where he was serving in his Foreign Ministry. Her intent as to her 'domicile' or as to her 'permanent residence,' as distinguished from her actual 'residence,' 'principal dwelling place,' and 'place of abode,' is not material." *Id.* at 506. Thus, when the INA specifies that an individual's residence is determined "without regard to intent," that simply means that the inquiry is objective, not subjective. It does not, as Plaintiffs contend, convert "residence" into "physical presence."

Because the Department's reading better comports with the plain meaning, structure, and legislative history of the INA, the Court concludes that Plaintiffs' challenge to the Department's interpretation fails.

2.      *Was the Department's Revocation of the CRBAs Permissible?*

That conclusion, however, does not fully resolve the Sitzmans' claims. In addition to challenging the Department's current construction of "residence," Plaintiffs challenge the Department's authority to revoke the Sitzmans' previously-issued CRBAs. Dkt. 28 at 15. Plaintiffs make few specific arguments as to how or why the revocations were impermissible, merely asserting that the Department acted unlawfully when it "whipsaw[ed] the Plaintiffs with interpretations of 'residence' that change[d] with the tides or moon phases." Dkt. 56 at 2. Beyond that, Plaintiffs simply "adopt[] in full" the analysis of the hearing officer, who stated that "principles of fundamental fairness require that the Department honor the CRBAs that were issued based upon [the prior] interpretation of the law." Dkt. 52 at 4-5 (quoting AR

CIV000260). Given the level of generality of these statements, it is difficult to discern the basis for Plaintiffs' contention that the revocations were unlawful. Particularly where, as here, Plaintiffs are represented by counsel, "[i]t is not the Court's responsibility to formulate the [parties'] arguments for them or to scour the record for evidence that will support their assertions, and it will not do so here." *United States ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 19–20 (D.D.C. 2008). Read generously, however, the Court can discern four possible arguments, none of which support vacatur of the Deputy Assistant Secretary's decision.

*First*, Plaintiffs argue that "until roughly 2007, Defendants interpreted and applied the term 'residence' in [§] 1401(c) to mean any physical presence short of a brief, hours-long transit through the United States." Dkt. 52 at 6. They contend that, after granting CRBAs to the Sitzmans, "Defendants cannot whipsaw the Plaintiffs with interpretations of 'residence' that change with the tides or moon phases," Dkt. 56 at 2, and the revocations are therefore "arbitrary and capricious under the APA." Dkt. 52 at 7. The Court disagrees.

To be sure, when changing an interpretation or policy, the APA "demand[s] that [an agency] display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Supreme Court has been clear, for example, that "[a]n agency may not . . . depart from a prior policy *sub silentio*." *Id.* Plaintiffs, moreover, are correct that the Jerusalem consulate previously publicized a practice of granting CRBAs based on minimal physical presence in the United States. The Department agreed through stipulation that, "[a]t the time of the CRBA applications and thereafter until at least 2007, the [Jerusalem] [c]onsulate published and disseminated a fact sheet that explained that if both parents were United States citizens, they could transmit citizenship to their children provided that one of the parents could

32

show one day of physical presence in the United States" and that the Sitzmans "applied for, and the [c]onsulate issued, the CRBAs in question" based "upon [those] instructions and explanation of the law in the aforesaid factsheet."  AR CIV000263.

There are two problems, however, with Plaintiffs' argument.  As an initial matter, although the Jerusalem consulate previously announced a practice in accord with Plaintiffs' view of the statute, Plaintiffs have not shown that *the Department* has changed position at all.  To the contrary, as the Department explains in its briefs, the "State Department's interpretation has *consistently* been that temporary visits to the United States do not establish 'residence.'"  Dkt. 57 at 4.  Various versions of the FAM support this contention going back to at least 1998.  *See* 7 FAM 1134.3-1 (updated April 1, 1998).  The Jerusalem consulate (and other consulates), accordingly, appears to have implemented its own, erroneous interpretation of the INA separate from—and at odds with—the Department's guidance.  Although Plaintiffs may reasonably see this as a failure of oversight, "the fact that a preliminary determination by a local agency representative is later overruled at a higher level within the agency does not render the decisionmaking process arbitrary and capricious."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007).  To the contrary: "as long as the proper procedures [are] followed," agencies can "change[] their minds" higher up the hierarchical chain, *id.*, and the INA itself expressly authorizes the Secretary of State "to cancel any. . . Consular Report of Birth Abroad . . . if it appears that such document was . . .  erroneously obtained," 8 U.S.C. § 1504(a).

Moreover, even if the Jerusalem consulate's fact sheet could be attributed to the Department as a whole, the Department rejected that interpretation because it is inconsistent with the meaning of the statute.  For the reasons explained above, the INA cannot be construed to equate "one day of physical presence in the United States" with "residence."  Rejecting any such

prior interpretation in favor of a reading that is consistent with the statutory text, structure, and purpose passes muster under the APA. To construe the APA to compel an agency to forever bind itself to a flawed interpretation of a statute turns the requirement of "reasoned decisionmaking" on its head. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 52 (1983). The Court declines to do so here.

*Second*, Plaintiffs adopt the hearing officer's contention that "[a]ny change in the interpretation and application of the law should be applied only prospectively, if at all." AR CIV000260. As explained above, Plaintiffs have not shown that the Department actually changed any Department-wide policy. But even putting that problem aside, this contention also fails. True, the Supreme Court has cautioned that "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), and that, in the context of adjudication, "retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles," *SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194, 203 (1947). But, here, the Department did not engage in retroactive rulemaking and, by reconsidering the consulate's prior decision to grant the CRBAs, the Department merely exercised the authority that Congress conferred on the Secretary. The Department, accordingly, did nothing more than Congress authorized and, in doing so, it enforced the law as Congress enacted it.

To be sure, had the Department revoked the Sitzmans' U.S. citizenship, that would have raised grave equitable considerations, and, indeed, would have required a "federal judicial order." *Xia*, 865 F.3d at 650. As the Supreme Court has explained, "[i]t would be difficult to

exaggerate [citizenship's] value and importance," *Schneiderman*, 320 U.S. at 122, and its

revocation "may result in 'loss of both property and life; or of all that makes life worth living,'"

*United States v. Minker*, 350 U.S. 179, 187 (1956) (quoting *Ng Fung Ho v. White*, 259 U.S. 276,

284 (1922)). But that is not what the Department did. Rather, it revoked a document *evidencing*

the Sitzmans' citizenship. As in *Xia*, "the statutory authority on which the government relied is

quite explicit that it authorizes only revocation of certain evidence of citizenship, *not* the

citizenship status itself, . . . administrative actions alone are inadequate to extinguish any United

States citizenship plaintiffs may have." 865 F.3d at 655 (emphasis in original). Although

undoubtedly a serious step, revocation of a CRBA is far less serious than revoking citizenship

from someone who was—and then, as a result, no longer—a U.S. citizen, and Plaintiffs have

failed to identify any legal or factual basis to question the Department's authority to correct its

prior, erroneous issuance of the CRBAs.

 *Third*, the hearing officer cited to a 1985 law review article, entitled "Regulatory

Estoppel." *See* AR CIV000260 (citing Peter Raven-Hansen, *Regulatory Estoppel: When

Agencies Break Their Own "Laws,"* 64 Tex. L. Rev. 1 (1985)). That article explores "[w]hether

an agency should be estopped from acting when it has broken its own law." Raven-Hansen,

*Regulatory Estoppel*, 64 Tex. L. Rev. at 2; *see also Black v. Snow*, 272 F. Supp. 2d 21, 26 n.5

(D.D.C. 2003) (citing *Regulatory Estoppel* for "the general principle that agencies are obligated

to follow their own regulations"). It is difficult to see how the concept of "regulatory estoppel"

applies here, as the hearing officer did not identify any regulation that the Department allegedly

violated.

 *Fourth*, and finally, the hearing officer urged the Department to consider "policy issues

involved in overriding decisions that are many years old and have the effect of canceling

citizenship of individuals who thought that their status was long settled." AR CIV000261. Although the Court is mindful of the Saltzmans' frustration, "'policy judgment[s]' are 'for the agency'" and for Congress, "'—not this [C]ourt—to make.'" *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 953 (D.C. Cir. 2007) (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 631 (D.C. Cir. 2000) (alteration in original)). The Court concludes that the Department lawfully determined that the Sitzmans' CRBAs were erroneously issued, and it is not the Court's role to go beyond that judgment.

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Plaintiffs' motion for summary judgment, Dkt. 52, is **DENIED**, and the Department's cross-motion for summary judgment, Dkt. 53, is **GRANTED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: July 17, 2019